UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KRISTA PRATHER,                          )
                                         )
            Plaintiff,                    )
                                         )
            v.                            )          No. 1:19-cv-03192-SEB-TAB
                                         )
MIDCONTINENT INDEPENDENT                  )
SYSTEM OPERATOR, INC.,                    )
                                         )
            Defendant.                    )

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment

[Dkt. 32]. Plaintiff Krista Prather has brought this action against her former employer,

Midcontinent Independent System Operator, Inc. ("MISO"), alleging that she was

terminated because of her sex, in violation of Title VII of the Civil Rights Act of 1964.

For the reasons detailed below, we <u>DENY</u> Defendant's Motion.

**Factual Background**

**The Parties**

MISO is a not-for-profit member-based organization and regional transmission

operator that provides bulk power transmission services and facilitates a wholesale

energy market. Paul Decl. ¶ 3. It serves the electrical transmission and energy market

needs for much of the mid-section of the United States and a portion of Canada, from

Manitoba, Canada to New Orleans, Louisiana. *Id.* Ms. Prather began employment with

MISO on March 15, 2004 in the position of Technical Lead, Voice Systems in MISO's

Carmel, Indiana location.  She received promotions throughout her tenure, and, at the time of her termination in 2019, served as Manager of Desktop Solutions in MISO's IT department.  In that position, Ms. Prather had five direct reports: Paul Kennedy, Dyonte Holmes, Anna Hinds, Surya Cheek, and Mat Gingerich.  Prather Dep. at 82, 84–85.  Ms. Prather, herself, was supervised at that time by the Director of IT Infrastructure, Jon Adams, who, in turn, reported to Tony Johnson, Senior Director of IT Infrastructure.  *Id.*

**Defendant's Employee Handbook and Employment Policies**

All MISO employees, including Ms. Prather, receive a copy of the MISO's Employee Handbook upon hire, and a new copy each time the handbook is updated.  *Id.* at 84, 93.  Throughout her employment, Ms. Prather was required to acknowledge her understanding of and compliance with the Employee Handbook, with she did most recently on February 14, 2018.  *Id.*  The following MISO employee policies are set forth in the Employee Handbook:

**Equal Employment Opportunity**

Individuals are selected for employment and advancement without regard to race, color, religion, national origin, sex, sexual orientation, gender identity, genetic information, age, disability, marital, familial or veteran status or any other protected status under federal, state or local law.

**Standards of Conduct**

Employees of MISO are expected to accept and adhere to the Company's policies and procedures, respect the rights and feelings of others and exhibit a high degree of personal and professional integrity at all times.  Integrity and high standards of ethics are fundamental to MISO's beliefs and must be upheld by all employees.  No action shall be performed which could raise questions of conflict of interest or legality in the minds of MISO customers or stakeholders.

…

**Responsibility of the Employee**

…

Each employee has specific responsibilities with respect to this Handbook. These include maintaining individual compliance, being alert to situations that could result in inadvertent actions that are improper and bringing violations to the attention of appropriate personnel. An employee should seek the counsel of management if they have any doubts about their responsibilities.

**Failure to Conform**

An employee whose conduct fails to conform to this Employee Handbook may be subject to appropriate corrective action, and/or termination of employment.

**Revision**

Revisions may be made periodically to this Employee Handbook. Human Resources is responsible for maintaining and updating all Employee Handbook changes. It is the responsibility of each employee to read and ensure understanding of the updated Employee Handbook each year during the required annual recertification process. If employees have questions about anything found in the Handbook, they should reach out to their manager or HR Business Partner for clarification.

Exh. A–E to Paul Decl.

Appendix A of the Employee Handbook is entitled "Code of Business Ethics Policy" and provides in relevant part as follows:

**1.      Purpose**

…

The Code of Business Ethics Policy (the "Code") provides general guidelines as well as certain obligations and responsibilities, to assist Directors and Employees in conducting their day to day business activities ethically and in accordance with applicable laws, rules, regulations, and MISO policies. It is

the responsibility of each Director and Employee to be able to identify ethical, legal, and compliance issues and act appropriately or seek appropriate advice from the many resources available to assist with these matters.

Maintaining adherence to the Code is a high priority at MISO.  Deviations from the Code or applicable federal, state, and local laws, rules, and regulations may result in corrective action, termination of employment, and/or possible civil or criminal penalties.

…

## 4.    Responsibilities

## 4.1    Directors and Employees

Directors and all Employees of MISO are expected to act in accordance with the MISO cornerstones and maintain the highest ethical standards.   In particular, it is the responsibility of each Director and Employee to be familiar with the information contained in this Code and MISO policies, paying particular attention to the policies that pertain to their job responsibilities and workplace conduct.   In addition, Directors and Employees have the responsibility to:

…

- Cooperate fully in investigations, audits, and procedure monitoring and provide all requested documentation.

…

## 5.3.1  Accountability

Directors and Employees are responsible for knowing the laws, rules, regulations, MISO policies, and MISO Tariff provisions applicable to their positions at MISO.  Directors and Employees will be held accountable for their conduct with regard to those laws, rules, regulations, MISO policies, and MISO Tariff provisions.

…

## 5.3.3  Discipline

Any Employee failing to comply with the Code may be subject to corrective action, up to and including termination, at the discretion of MISO. The decision to discharge an Employee is the responsibility of three decision-makers: (1) a member of management, (2) manager representative of Legal, and (3) a representative of Human Resources. Employees should understand that violations of laws, rules, or regulations may also result in legal proceedings and possible civil or criminal penalties. Please see the Employee Handbook for additional information.

…

### 5.10   Interacting with Suppliers and Contractors

It is MISO's policy to only do business with third parties that conduct business ethically and do not subject MISO to liability (civil or criminal) or cause MISO reputational harm. Conducting due diligence and engaging in competitive bidding in accordance with the Supply Management Policy, in regards to third parties will minimize risk to MISO and its reputation by helping to avoid relationships which may implicate MISO through the potential misconduct of its business partners.

Directors and Employees have a responsibility to adhere to the following rules when engaging or interaction with suppliers:

- Direct or conduct the procurement of goods or services from any Supplier consistent with the Supply Management Policy.

  …

- Create and maintain all records accurately to document the procurement process and to substantiate procurement decisions.

- Comply with all MISO policies and procedures in making procurement decisions. Be careful to avoid conflicts of interest between MISO and any third parties.

Exh. F to Paul Decl.

MISO's Employment Handbook further references and incorporates MISO's

Supply Management Policy which explains the methods and requirements for procuring

goods and services and includes the spending limits for all MISO employees. Prather

Dep. at 101–02.  The applicable portions of the Supply Management Policy provide as follows:

### 4.2   Procurement Method #1 – Oracle Procurement System.

…

- *Multiple Purchase Requisitions to a Supplier for the same Goods and/or Services to avoid spending authorization limits and/or to circumvent other Corporate Policies and Procedures are prohibited.*

- *A Purchase Requisition must be approved by a person other than the employee that entered the requested into the iProcurement System, except for those Purchase Requisitions that are valued at $100 or less.*

…

### Appendix A: Delegations of Authority

…

| Position | Expenditure Authorization Limits |
|---|---|
| *Full-time MISO Employee* | *$0 to $100* |
| *Supervisor or Lead* | *> $100 to ≤ $10,000* |
| *Manager or Senior Manager* | *≤ $50,000* |

Prather Dep. at 103–05; Exh. 18 to Prather Dep.

**Plaintiff's Job Responsibilities**

At all times relevant to this litigation, Ms. Prather served as MISO's Manager of Desktop Solutions.  In that position, Ms. Prather was responsible for directing or conducting the procurement of goods and services from suppliers consistent with MISO's

Supply Management Policy.[1]  Prather Dep. at 100.  As a manager, Ms. Prather was permitted under MISO's Supply Management Policy to approve purchase orders up to $50,000 but needed approval from her supervisor for any higher amount.  *Id.* at 104–05; Johnson Decl. ¶ 3.  Although the Supply Management Policy provides that employees are prohibited from approving multiple smaller purchase orders for the same goods in order to avoid a spending authorization limit, Ms. Prather claims that her department regularly and customarily ordered large numbers of computer supplies, often placing multiple orders on the same day that in aggregate totaled over $50,000, yet, prior to her termination, she was never disciplined for such conduct or told such action violated the Supply Management Policy.[2]  Prather Dep. at 103–04; Prather Decl. ¶ 3.

Ms. Prather relied on one of her direct reports, Paul Kennedy, to place orders and communicate with vendors.  Before the orders placed by Mr. Kennedy for the department were finalized, Ms. Prather reviewed them to ensure the correct items were being ordered.  Prather Decl. ¶ 4.

**Defendant's Desktop Refresh Project**

In December 2018, Ms. Prather was tasked with replacing approximately 400 MISO computers that were more than four years old and no longer compatible with Windows 10 ("the Desktop Refresh").  The Desktop Refresh was set to begin in January

---

[1] Prior to mid-2018, MISO's Asset Management group was responsible for placing all orders.  In mid-2018, however, Ms. Prather's department began placing its own orders because of a staffing issue in Asset Management.  Prather Decl. ¶ 4.

[2] On August 3, 2018, for example, Ms. Prather approved four purchase orders that in the aggregate totaled over $50,000 and was not disciplined for those orders.  Prather Decl. ¶ 2.

2019 with a completion date of 2020.  Ms. Prather and Mr. Kennedy utilized vender SHI International to purchase computers for the Desktop Refresh and processed purchase orders using the Oracle Procurement System.  Prather Dep. at 9, 10; Paul Decl. ¶ 5.

On December 24, 2018, Mr. Kennedy submitted to Ms. Prather for approval more than twenty purchase requisitions from SHI International for the Desktop Refresh computer hardware, each under the $50,000 authorization limit, but together totaling $1,054,108.00.  Ms. Prather approved these purchase requisitions within a two-minute period on December 25, 2018.  According to Ms. Prather, it was not unusual for her to approve multiple purchase orders quickly nor was it unusual for her to be working on Christmas Day.  Prather Decl. ¶ 5.  Ms. Prather testified that she did not instruct Mr. Kennedy to structure the transactions in a manner to avoid her spending authorization limit and that it was her understanding that a SHI representative had requested that the orders be divided in such a manner.  *Id.* ¶¶ 10–11; Prather Dep. at 105.  In reviewing the purchase orders, Ms. Prather testified that she focused on ensuring the accuracy of the equipment that was being purchased, rather than the dollar amounts of the invoices. Prather Decl. ¶ 5; Prather Dep. at 107.

After Ms. Prather approved the purchase orders, Harold Wims, the Senior Manager of Supply Management, was also required to approve the orders, which he did. Mr. Wims testified that he never reported any violation of the Supply Management Policy to Ms. Prather or anyone else at MISO because the policy states only that purchases cannot be split if the purpose is to avoid approvals and he was unaware at the time he approved the orders whether they were placed with the intention to avoid spending limits

8

or for some other, legitimate reason.  Wims Decl. ¶ 7; Prather Decl. ¶ 6; Paul Dep. at 21.

According to Mr. Wims, he was aware that a computer refresh was in progress and

multiple small dollar orders for computer equipment were not uncommon at MISO.

Wims Decl. ¶ 9.

      Ms. Prather approved the orders with the understanding that the cost would not

count against her department's budget until the items were received.  Prather Decl. ¶ 7.

Based on prior experience with large orders such as those she approved on December 25,

Ms. Prather expected that the equipment for the Desktop Refresh would arrive in batches,

such that the cost of the equipment would be spread out over a few months.  However, all

the products ordered by Mr. Kennedy and approved by Ms. Prather for the Desktop

Refresh arrived within the span of a few days in January 2019, causing Ms. Prather's

department to show a variance in the budget forecast for the month.  Prather Dep. at 10–

11; Prather Decl. ¶ 7.  Upon learning of the variance, Ms. Prather discussed the situation

with Billy Cahill, Sr., Financial Planning and Analysis Sr. Business Planning Partner,

who adjusted the year-end forecast for Ms. Prather's department to allow it to remain

under budget for the year.  Ms. Prather also discussed the variance with Shane Irving, Mr.

Cahill's predecessor, whom she says confirmed that the budget forecast could be

adjusted.  Prather Decl. ¶¶ 8, 9; Prather Dep. at 12.

      On February 6, 2019, after being informed by Chief Information Officer John

Goode that there was a significant variance in budget for January 2019 stemming from

the approval by Ms. Prather of multiple purchase orders to a single vendor totaling more

than $900,000, Senior Director of IT Infrastructure Anthony Johnson discussed the

budget variance with Ms. Prather.  Johnson Decl. ¶¶ 3, 4; Johnson Dep. at 10, 21–22.
There is some dispute regarding what precisely was said at this meeting.  Ms. Prather has
testified that Mr. Johnson inquired as to why the budget forecast was over for January
2019, to which she explained that the arrival of the orders was supposed to have been
spread out over January, February, and March, thereby also spreading out the payments,
but instead the equipment came in all at once in January.  Prather Dep. at 11.  Ms. Prather
claims that upon hearing her explanation Mr. Johnson thanked her for her time and said
he would take the information to Mr. Goode.  According to Ms. Prather, Mr. Johnson
never asked why she did not seek spending authorization for the orders;  in fact, she
claims that she did not even know at that time that she was subject to a $50,000 spending
limit under the Supply Management Policy.  *Id.* at 11–12, 16–17; Prather Decl. ¶ 12.

In contrast, Mr. Johnson claims that he did inquire of Ms. Prather regarding her
failure to obtain the approvals for the purchases, since, in the aggregate, they far
exceeded her $50,000 authorization limit.  Mr. Johnson testified that she responded that
there were multiple orders because MISO had multiple locations, which he believed to be
a misleading and nonsensical explanation.  Johnson Decl. ¶ 5; Johnson Dep. at 40.
Following his conversation with Ms. Prather, Mr. Johnson contacted Jami Paul, the
Associate HR Business Partner, to explain his concerns and to request that Ms. Paul
undertake an investigation into Ms. Prather's actions.  Johnson Decl. ¶ 7.

**HR Investigation and Plaintiff's Termination**

On February 7, 2019, Ms. Paul interviewed Ms. Prather about the Desktop Refresh
purchases, focusing on the reason(s) Ms. Prather approved more than one million dollars

10

in computer hardware purchases that had been broken into more than twenty smaller purchase requisitions, each under $50,000.  Ms. Prather explained to Ms. Paul, as she had told Mr. Johnson, that the budget variance was the result of all the orders being delivered in January, when she had expected them to arrive incrementally over the first few months of the year.  Prather Dep. at 14.  In response to Ms. Paul's question regarding her spending limit, Ms. Prather replied that she was unaware she was subject to a $50,000 limit on her approval authority for purchases she authorized.  *Id.* at 16–17.  She also informed Ms. Paul that it was Mr. Kennedy who had placed the orders and she understood that the vendor, SHI, had requested that the orders be divided as they were. *Id.* at 15; Prather Decl. ¶ 13.

According to Ms. Paul, Ms. Prather appeared nervous during the meeting, asking multiple times whether she was in trouble.  Paul Decl. ¶ 8.  Based on Ms. Prather's demeanor and the information she provided during the meeting, Ms. Paul suspected that Ms. Prather had violated MISO's Supply Management Policy.  *Id.*

After meeting with Ms. Paul, Ms. Prather checked with Mr. Kennedy regarding the structure of the orders in the manner they had been, and he responded that SHI had informed him that they had to be done that way for them to arrive on time.  Ms. Prather asked if he had proof of that directive, and he told her he would get it to her.  Prather Dep. at 36–37.  Ms. Prather next met with her supervisor, Mr. Adams, to discuss these issues, and Mr. Adams recommended that Ms. Prather request that the vendor, SHI, send an email confirming that its representative had requested that the orders be split.  Because

11

Mr. Kennedy was MISO's contact with SHI, Ms. Prather enlisted him to make the contact with SHI, which Mr. Kennedy did.  Prather Decl. ¶ 14.

Later that same day, on February 7, 2019, Ms. Prather received an email message from Mr. Kennedy that included a forwarded message from SHI Senior Account Manager Christine Vickers thanking Mr. Kennedy for allowing SHI to split the corporate refresh into smaller batches.  Prather Dep. at 36–37; Exh. 4 to Prather Dep.  Ms. Prather, in turn, emailed Ms. Paul, and copied Mr. Johnson, to explain that multiple purchase orders were submitted because of SHI's concern regarding the timely shipment of the computer hardware.  Directly below her explanation, Ms. Prather attached the email from Ms. Vickers, but failed to include the email's header containing the to/from, date, time, and subject lines.  Exh. 3 to Prather Dep.  According to Ms. Prather, she does not remember intentionally deleting this information and was likely just trying to "clean the email up."  Prather Dep. at 43.  Upon noticing the missing information, Ms. Paul contacted Ms. Prather and requested that she send the complete copy of Ms. Vickers's email, which Ms. Prather did the next morning, on February 8, 2019.  Paul Decl. ¶ 9; Exh. 4 to Prather Dep.  Ms. Paul noted that the email from Ms. Vickers to Mr. Kennedy had been sent at 2:17 p.m. the day before, which was after the time Ms. Paul had interviewed Ms. Prather.  Paul Decl. ¶ 9.

After completing her investigation, Ms. Paul recommended to Mr. Johnson that Ms. Prather be terminated on grounds that she had violated MISO's Supply Management Policy and provided false and misleading information during the investigation.  *Id.* ¶ 10. Ms. Paul concluded that Mr. Kennedy, as the employee who placed the orders, had also

violated the Supply Management Policy, but she did not recommend his termination at that time.  Although she had not spoken with him in connection with her investigation, she believed that he was merely following Ms. Prather's directions and that further investigation into his actions was necessary before a termination decision could be made. *Id.* ¶ 11; Paul Dep. at 57.  Ms. Paul was also aware that, in addition to Ms. Prather, Mr. Wims had approved the Desktop Refresh orders, but Ms. Paul did not interview Mr. Wims as part of her investigation.  Paul Dep. at 21, 23.  Paul Decl. ¶ 12.

After considering Ms. Paul's recommendation and receiving verification that other employees had been terminated for similar policy violations,[3] Mr. Johnson made the decision to terminate Ms. Prather's employment.  Johnson Decl. ¶ 8.  On Monday, February 11, 2019, Mr. Johnson and Ms. Paul called Ms. Prather to inform her of her termination.  According to Mr. Johnson, he told Ms. Prather that her employment was being terminated effective immediately for violating the Supply Management Policy and for providing false and misleading information during the investigation.  Johnson Decl. ¶¶ 8–9.  Ms. Prather claims she was told she was being terminated only for the policy violation but not for providing untruthful information.  Prather Decl. ¶ 18.

Shortly after Ms. Prather's termination, Ms. Paul contacted her to arrange for the return of Ms. Prather's MISO-owned cellphone and laptop computer.  When Ms. Prather

---

[3] Ms. Paul reviewed company records and confirmed that, including Ms. Prather, MISO terminated approximately twenty (20) employees for violations of company policies between 2014 and February 2019.  Of those twenty, twelve (12) were male and eight (8) were female. The company policies violated included the Code of Business Ethics, Standards of Conduct, Employee Handbook, Appropriate Use Policy, Supply Management Policy, and Anti-Harassment Policy.  Paul Decl. ¶ 16.

returned the devices, both the laptop and cellphone had been wiped clean.  According to

Ms. Prather, she did so in line with her practice of requiring others who were leaving the

company to erase the content on their company-owned devices.  Prather Dep. at 53–54.

**Defendant's Internal Audit Following Plaintiff's Termination**

On February 26, 2019, approximately two weeks after Ms. Prather was terminated,

MISO's Internal Audit team initiated a follow-up investigation into the procurement

process used for the Desktop Refresh.  Leatherman Decl. ¶ 3.  Throughout March 2019,

the Internal Audit team worked with MISO's Asset Management, Desktop, and Security

teams to confirm that the computer equipment purchased for the Desktop Refresh had

been received and inventoried.  *Id.* ¶ 4.  The Internal Audit team was unable to account

for all the assets procured, however, because of incomplete asset inventory records and

lax inventory management processes.  *Id.*

During this investigation, on March 13, 2019, MISO's Director of Internal Audit,

Lynna Leatherman, interviewed Mr. Wims, who was responsible for ensuring compliance

with the Supply Management Policy, in an effort to better understand the Supply

Management process as well as to determine Mr. Wims's personal understanding of the

laptop purchases.  *Id.* ¶ 5.  Ms. Leatherman learned during this interview that Mr. Wims

had cursorily approved the Desktop Refresh laptop purchases without questioning or

investigating whether such purchases violated the Supply Management Policy or

reporting the issue to any other MISO employee.  As a result of these findings, Mr. Wims

was also terminated on May 15, 2019.  *Id.* ¶ 6; Pl.'s Exh. 8.

14

On March 15, 2019, Ms. Leatherman interviewed Mr. Kennedy regarding the Desktop Refresh orders.  Mr. Kennedy stated that he entered multiple purchase requisitions because it was the most expedient way to get the orders delivered.  He explained that he chose the amount of $50,000 when requesting the bid from SHI because it was a "round number, manageable."  *Id.* ¶ 7.

In addition to the internal audit, MISO also hired outside counsel to conduct an independent investigation.  Outside counsel discovered in Mr. Kennedy's "Deleted" folder in his Outlook account email communications with Ms. Vickers from SHI spanning several months which evidenced Mr. Kennedy's efforts to skirt the Supply Management Policy.  In a July 9, 2018 email, for example, Mr. Kennedy requested that Ms. Vickers split up laptops on an order because he could not submit an order over $50,000 without special permission.  In a series of emails dated October 23, 2018, regarding price quotes for computer equipment, Mr. Kennedy informed Ms. Vickers that as long as the quote remained under $50,000, it could remain under the single quote.  Mr. Kennedy requested in a December 13, 2018 email that Ms. Vickers split a purchase of 701 pieces of computer equipment into $50,000 quotes to which Ms. Vickers responded that she would be happy to do so.  Finally, outside counsel found a February 7, 2019 email from Mr. Kennedy forwarding to Ms. Prather his December 13 communications with Ms. Vicker, in which he requested that she split the Desktop Refresh order.  *Id.* ¶ 8.

Based on her review of Mr. Kennedy's deleted emails, Ms. Leatherman determined that he had purposefully split the laptop purchase requisitions into amounts less than $50,000 to avoid having to secure approval for the transactions in violation of the Supply

Management Policy.  As a result, the company leadership team, which included Mr. Johnson, decided to terminate Mr. Kennedy's employment.  *Id.* ¶ 10.  Mr. Kennedy was terminated on May 15, 2019.  Johnson Dep. at 56; Pl.'s Exh. 8.

**Plaintiffs EEOC Charge and the Instant Lawsuit**

In a letter dated March 5, 2019, approximately one week after MISO's internal audit investigation had commenced, Ms. Prather's attorney notified MISO that Ms. Prather was filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Her EEOC charge was officially filed on April 11, 2019.  She received her notice of right to sue and timely filed the instant complaint on July 30, 2019, alleging she was terminated because of her sex, in violation of Title VII.  MISO moved for summary judgment on August 14, 2020.

## Legal Analysis

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.     Discussion

### A.     Discriminatory Termination Claim

Ms. Prather claims in this lawsuit that she was terminated based on her sex in violation of Title VII.  An analysis of this claim invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'"  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Ortiz*, 834 F.3d at 765.

Here, after careful review of the record, we find that Ms. Prather has adduced sufficient circumstantial evidence, when viewed as a whole, to create a triable issue as to whether her termination of employment was motivated by discriminatory intent by MISO.  The Seventh Circuit has recognized three types of circumstantial evidence on which a plaintiff may rely "to provide a basis for drawing an inference of intentional discrimination."  *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).  Such evidence includes: "ambiguous or suggestive comments or conduct; better treatment

17

of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) (quotation marks and citation omitted).  "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe*, 20 F.3d at 736.

Here, Ms. Prather presents evidence that she was terminated on February 11, 2019, ostensibly for violating MISO's Supply Management Policy,[4] yet neither Mr. Wims nor Mr. Kennedy, the two male employees involved in the same incident, was even *interviewed* until more than a month after Ms. Prather's termination and until approximately ten days after MISO first received notice from Ms. Prather's attorney that she would be filing a charge of discrimination with the EEOC in relation to her termination.  While MISO attempts to make much of the fact that both men were eventually interviewed and ultimately terminated on May 15, 2019, the timeline is sufficient to raise questions regarding the genuineness of MISO's proffered reason for Ms. Prather's termination.

MISO also argues that these facts are not sufficient to raise an inference of discrimination because, at the time of Ms. Prather's termination, it had no reason to

---

[4] MISO claims that Ms. Prather's termination was also based in part on Ms. Paul's determination that Ms. Prather had supplied misleading or untruthful information during MISO's investigation into the policy violation, but Ms. Prather denies being told that was a reason for her termination. Accordingly, there exists a genuine issue of material fact regarding whether this was an additional reason for Ms. Prather's termination or simply an after-the-fact justification.

believe that Mr. Kennedy's or Mr. Wims's actions justified immediate termination. However, the evidence before us shows that when the decision was made to terminate Ms. Prather, MISO did have knowledge that Mr. Kennedy was the one who had actually placed the orders in violation of the Supply Management Policy and that Mr. Wims, who was the MISO employee responsible for ensuring compliance with the Supply Management Policy, had, like Ms. Prather, approved the transactions.  Ms. Paul maintains that, despite being aware of these facts at the time she recommended Ms. Prather's termination, she did not recommend either man's termination because she believed that it was at Ms. Prather's behest that Mr. Kennedy had structured the orders so as to avoid the spending authorization limit, and that she had no knowledge that Mr. Wims had taken any action in violation of the policy.

It is not clear how Ms. Paul reached those conclusions, however, since she concedes that she did not interview either man at any point during her investigation; where her knowledge of their involvement came from is not explained.[5]  Nor, for that matter, did Mr. Johnson conduct any such interview(s).  MISO cannot now use its claimed ignorance of the extent of Mr. Kennedy's and Mr. Wims's culpability as a shield against an inference of discrimination when it has failed to offer any explanation for its failure to interview either man before terminating Ms. Prather.  *See Baker v. Macon*

---

[5] Nor is there any other evidence that Ms. Prather instructed Mr. Kennedy to structure the Desktop Refresh purchases as he did.  While MISO's audit following Ms. Prather's termination showed that Mr. Kennedy had, in a July 9, 2018 email to Ms. Vickers, requested that SHI split up laptops on an order because he could not submit an order over $50,000 without approval, none of the emails discovered during the audit indicate that his direction to make such a request came from Ms. Prather.

*Resources, Inc.*, 750 F.3d 674, 677–78 (7th Cir. 2014) (holding that "selective enforcement or investigation of a disciplinary policy can [ ] show pretext" in a case where the company failed to "offer[ ] a reason why … it chose not to investigate whether [the plaintiff's] own supervisors violated the same reporting rule" as the plaintiff with regard to the same incident).  It seems to us particularly egregious not to have interviewed Mr. Wims before terminating Ms. Prather if only to inquire why he, like Ms. Prather, had approved the orders submitted by Mr. Kennedy, given that it was his responsibility to determine whether transactions complied with the Supply Management Policy or whether an exception to the policy applied.

As detailed above, MISO did not interview Mr. Kennedy or Mr. Wims until more than one month after it terminated Ms. Prather's employment, which was ten days after the company had received notice from Ms. Prather's attorney that she was filing an EEOC charge of discrimination.  Even then, after confirming during those interviews in mid-March 2019 and through the discovery of deleted email communications that both Mr. Kennedy's and Mr. Wims's actions violated the Supply Management Policy, neither man was terminated until May 15, 2019, approximately three months after Ms. Prather was terminated for the same policy violation, which was one month after Ms. Prather's EEOC charge was officially filed.

In sum, these facts, viewed as a whole and in the light most favorable to Ms. Prather, as we are required to do at the summary judgment stage, could support a reasonable jury's finding that MISO terminated Ms. Prather because of her sex in violation of Title VII and only seriously investigated and terminated the men involved in

the same incident after they were aware of Ms. Prather's EEOC charge in an effort to improve the optics of the situation and insulate itself from a discrimination claim.[6]  On the facts before us, determining whether such an inference of discrimination is appropriate "cannot be resolved by a legal rule; the answer depends on context, just as an evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory."  *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).  Evaluating MISO's proffered nondiscriminatory reason for Ms. Prather's termination and explanation for why her male counterparts involved in the same incident were not terminated until months after will require credibility determinations that cannot be resolved based only on the parties' written submissions.  Accordingly, Ms. Prather's Title VII claim based on sex discrimination survives summary judgment.

### B.   After Acquired Evidence

MISO argues that, even if Ms. Prather's discriminatory termination claim survives summary judgment, the after-acquired evidence rule precludes her from reinstatement or

---

[6] Ms. Prather claims she has also adduced circumstantial evidence of ambiguous or suggestive comments that supports her discrimination claim, but that evidence has limited relevance in our view.  Specifically, Ms. Prather has presented testimony that, shortly after her direct supervisor, Mr. Adams, was hired in April 2018, Mr. Johnson and another member of MISO's managerial staff approached Adams and told him they wanted Ms. Prather "eliminated from MISO."  Adams Decl. ¶ 4.  According to Mr. Adams, he had several meetings with Mr. Johnson at which this topic was raised, but Mr. Adams felt that terminating Ms. Prather without due diligence was not advisable.  *Id.*  To the extent such testimony is admissible as a statement of a party opponent, we do not find it particularly relevant to Ms. Prather's Title VII claim, given that the comments were not made in close temporal proximity to the termination decision nor is there any indication that the reason Mr. Johnson sought to have Ms. Prather terminated was because of her sex as opposed to some other lawful reason.

recovering front-pay or back-pay as of February 21, 2019, the date on which MISO discovered a different version of the email message Ms. Prather had previously forwarded to Ms. Paul on February 7, 2021 in which Mr. Kennedy asked Ms. Vickers to split the quotes from SHI into $50,000 increments.  MISO claims that it would have terminated Ms. Prather as soon as it became aware of the differing versions of the email; thus, MISO argues that any damages to which Ms. Prather might be entitled for her allegedly unlawful discharge are limited based on this after-acquired evidence of wrongdoing in line with the Supreme Court's holding in *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995), that, as a general rule, neither reinstatement nor front pay is an appropriate remedy in cases of employee wrongdoing "that would lead to legitimate discharge" and that the "beginning point" of any formulation of back pay award should be calculated from the date of the allegedly unlawful discharge to the date the evidence of wrongdoing was discovered.  *Id.* at 362.

To prevail on an after-acquired evidence defense, the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  *Id.* at 362–63.  Here, MISO claims that its discovery on February 21, 2019 of the email from Mr. Kennedy asking SHI to split the laptop orders would have led to Ms. Prather's immediate termination.  However, the fact that that email clearly established Mr. Kennedy's intentional violation of the Supply Management Policy for which he was not terminated until May 15, 2019, almost three months after its discovery, puts into doubt MISO's contention that it nonetheless would have immediately fired Ms. Prather on

22

the date the email was discovered.  Accordingly, we shall not attempt to resolve this issue on summary judgment due to factual disputes and credibility determinations warranting a jury's final determination.

### C.    Punitive Damages Claim

Finally, MISO seeks summary judgment on Ms. Prather's request for an award of punitive damages.  Punitive damages are available under Title VII if the plaintiff establishes that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  As described above, Ms. Prather was terminated after an investigation during which MISO completely failed to include either of the other two similarly culpable employees (both men) involved, interviewing them and ultimately terminating them only after receiving notification that Ms. Prather intended to file a charge of discrimination against MISO with the EEOC.  Based on these facts, a reasonable jury could conclude that MISO terminated Ms. Prather following a superficial, meagre, token investigation, which inadequacy they attempted to minimize or deflect or ameliorate by their subsequent decision to terminate the employment of two men, who were also involved in the incident along with Ms. Prather, in an attempt to insulate the company from Ms. Prather's discrimination claim.  If the jury were to reach these conclusions, it could also find that such actions were taken with "malice" or "reckless indifference."

It is true that an employer may not be held vicariously liable for the discriminatory actions of its managerial agents in circumstances where it can show that such actions are

contrary to the employer's "good-faith efforts to comply with Title VII." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (internal quotation marks and citation omitted). MISO thus points to its good faith efforts to comply with Title VII by implementing and enforcing written policies prohibiting discriminatory or retaliatory conduct. While evidence of an employer's anti-discrimination policies is "relevant to evaluating whether [the] employer engaged in good faith efforts to comply with Title VII, it is not sufficient in and of itself to insulate [it] from a punitive damages award." *E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 438 (7th Cir. 2012) (quotation marks and citation omitted). Here, questions of fact remain regarding whether MISO adhered to its anti-discrimination policies as well as the adequacy of its training of its managers to comply with such policies. It would be premature for the court to determine whether MISO's response demonstrated a good-faith effort to comply. Accordingly, MISO's motion is denied as to this issue.

## III.   Conclusion

For the reasons detailed below, Defendant's Motion for Summary Judgment [Dkt. 32] is <u>DENIED</u>. The case shall proceed accordingly.

IT IS SO ORDERED.

Date: _____3/25/2021_____

_[signature]_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Lauren Elizabeth Berger
BIESECKER DUTKANYCH & MACER LLC (Evansville)
lberger@bdlegal.com

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

R. Anthony Prather
BARNES & THORNBURG, LLP (Indianapolis)
tony.prather@btlaw.com